# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
)
**WILLIAM C. TUTTLE,**                        )
)
       **Plaintiff,**                        )
)
     **v.**                                      )     **Civil Action No. 13-365 (RMC)**
)
**SALLY JEWELL, Secretary of the**             )
**Interior,[1] *et al.*,**                     )
)
      **Defendant.**                        )
_____ )

## OPINION

Plaintiff William Tuttle leased restricted Indian land in Riverside County, California, for a term of 50 years. The land is owned by the United States in trust for the Colorado River Indian Tribes. In 2010, the Bureau of Indian Affairs terminated the lease, finding that Mr. Tuttle had violated several of its provisions. The termination decision was affirmed by the Interior Board of Indian Appeals. The Bureau of Indian Affairs and the Interior Board of Indian Appeals are constituent agencies of the Department of Interior. Plaintiff sued the Secretary of the Interior, in her official capacity, complaining that the agency's decision to terminate was arbitrary and capricious, in violation of both the Indian Long-Term Leasing Act and the terms of the Lease itself. Having reviewed the entire administrative record, the Court concludes that the agency acted reasonably on the record before it and within its authority. The Secretary's motion for summary judgment will be granted.

_____

[1] Secretary Jewell was sworn in as Secretary on April 12, 2013; she is automatically substituted as a party for Kenneth L. Salazar, the former Secretary of Interior. *See* Fed. R. Civ. P. 25(d).

# I. FACTS

## A. The Lease

Decades ago, in *United States v. Brigham Young University*, No. CV 72 3058-DWW (C.D. Cal. 1977), the United States brought suit to quiet title to the property at issue here. The district court found that the United States was the rightful owner of the property, in trust for the Colorado River Indian Tribes (Tribes), and that brothers William and Robert Tuttle wrongfully possessed a portion of the property "without any right, title, or interest therein."  AR 387-91.[2]  To resolve the dispute, the parties entered into a Stipulated Judgment, *see* AR 363-66, and on March 31, 1977, the Tuttles entered into a 50-year Lease with the Tribes, *see* AR 239-69. The Lease, designated as Business Lease B-509-CR, provided that the Tribes leased to the Tuttles, as Lessees, 98.24 acres of restricted tribal land (Property).  AR 240.

The Lease further provided that it was governed by "the Act of April 30, 1964 (78 Stat. 188), as supplemented by Part 131, Leasing and Permitting, of the Code of Federal Regulations, Title 25 — Indians, and any amendments thereto relative to business leases on restricted Indian lands, all of which by reference are made a part hereof."  AR 239.  The Act of April 30, 1964 (78 Stat. 188) declared certain lands, including the Property, to be held by the United States in trust for the Tribes.  Thus, the Lease acknowledged the fact of beneficial ownership and expressly stated that the Lease was governed by federal regulations and subsequent amendments to the regulations.

---

[2] The facts recited here come from the Administrative Record (AR) 1-473 and the Supplemental Administrative Record (AR Supp.).  *See* AR Index [Dkt. 15]; AR Supp. Index [Dkt. 21]; AR and AR Supp. [Dkt. 44]; *see also* Order [Dkt. 19] (granting in part and denying in part Plaintiff's motion to supplement the Administrative Record).

Restricted Indian land, like the Property here, can be leased for residential or business purposes with the approval of the Secretary of the Interior, pursuant to the Indian Long-Term Leasing Act of 1955, 25 U.S.C. § 415.  That Act provides:

> Any restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior for public, religious, educational, recreational, residential, or business purposes . . . .

25 U.S.C. § 415.  As recited in the Lease, the Secretary delegated that authority to the Commissioner of the Bureau of Indian Affairs (BIA); such authority was redelegated to the BIA Regional Director, and then redelegated again to the BIA Superintendent of the Colorado River Agency:

> The within Lease is hereby approved pursuant to authority delegated from the Secretary of the Interior to the Commissioner of Indian Affairs in Order 230 DM 1 (10 BIAM 2), 39 F.R. 32166-32167 redelegated to the Phoenix Area Director by 10 BIAM 3, and further redelegated to the Superintendent of the Colorado River Agency by 10 BIAM 11.

AR 248.

The Lease gave the Tuttles the right to live on the Property and to use the Property for "commercial or community development and all uses necessary to community development" for a term expiring in 2027.  AR 240.  In exchange, the Tuttles were required to pay rent to the Tribes and to maintain public liability and fire insurance.  After Robert Tuttle died, William Tuttle inherited his brother's ownership interest.[3]

---

[3] William Tuttle died in May 2015 when he was almost 92.  His wife, Carol, seeks to continue to reside at the leased property, and the William C. Tuttle and Carol M. Tuttle Family Trust, through Trustee Carol Tuttle, has been substituted as Plaintiff here.  *See* Substitution of Plaintiff [Dkt. 39].  For ease of reference, this Opinion refers to Mr. Tuttle as the Plaintiff/Lessee.

Mr. Tuttle was required to pay "Base Rent," annually and in advance, at a per-acre rate, starting from five dollars per acre for years one through five of the lease term ($491.20/year), increasing to ten dollars per acre for years six through twenty ($982.42/year), and increasing to fifteen dollars per acre for years twenty-one through fifty ($1,473.60/year). AR 240-41. Section V of the Lease required:

> All rents shall be paid without prior notice or demand. Past due rental shall bear interest at ten percent (10%) per annum from the due date until paid, but this provision shall not be construed to relieve the Lessee from his obligation to make timely rental payments.

AR 244.

Section VI of the Lease required the Lessee to carry liability insurance with prescribed minimum coverages, "written jointly to protect Lessee and Lessor" and that "[e]vidence of insurance shall be furnished to the Secretary" of the Department of the Interior. *Id.* Article 3 of the Lease Addendum required the Lessee to carry fire insurance jointly in the names of Lessee and Lessor and to provide proof of insurance to the Secretary. AR 250.[4]

At some point, Mr. Tuttle developed the Property for commercial purposes, *see* AR 39, and as a result on June 2, 1986, the parties executed a Modification to the Lease. *See* AR 74-76. The Modification required the payment of "Percentage Rent," in addition to Base Rent, in the amount of three percent (3%) of the gross receipts of all business conducted on the Property:

> Modified to Provide: For the payment of percentage rental for business conducted on the leased premises, as follows:
>
> . . . In addition to the foregoing rental, Lessee shall pay to Lessor not later than thirty (30) days after each anniversary date of the terms of this Lease, commencing March 31, 1986, THREE PERCENT

---

[4] The Lease incorporated Articles 1 through 32, set forth in an Addendum. AR 244, 249-69.

>(3%) of the gross receipts of all business conducted on the leased premises, including Lot Sales, Lot Rentals, and any other business or businesses operated on the leased premises, whether such business is conducted by Lessee, sublessee or assignee.

AR 75.  The 1986 Modification required an annual accounting as follows:

>The Lessee shall, not later than sixty (60) days after the ending date of each calendar year of the term of this Lease, . . . submit to the Lessor and the Secretary certified statements of gross receipts.  With said statements, Lessee shall tender payment of the amount due under Rental provision IV (PERCENTAGE RENT) above.  Said statements shall be prepared by an independent certified public accountant, duly licensed in either the State of Arizona, or the State of California, in conformity with standard accounting procedures, accompanied by an opinion rendered by the certified public accountant.

AR 75.

>Article 17 of the Lease provided remedies in the event of default:

>Should the Lessee default in any payment of monies as required by the terms of this lease, and if such default shall continue uncured for the period of thirty (30) days after written notice thereof by the Secretary to Lessee, or should Lessee breach any other covenant of this lease, and if the breach of such other covenant shall continue uncured for a period of sixty (60) days after written notice thereof by the Secretary to the Lessee, then the Secretary may either

>A. Proceed by suit or otherwise to enforce collection or to enforce any other provision of this lease; or

>B. Re-enter the premises and remove all persons and property therefrom, except for authorized sublessees and the personal property thereof; and either:

>>(1) Re-let the premises without terminating this lease . . . [or]

>>(2) Terminate this lease at any time even though Lessor and the Secretary have exercised the rights as outlined in (1) above.

AR 262-63.  In other words, in the event of default, the BIA (as the Secretary's delegee) had to

send written notice of such default to the Lessee.  The Lease provided a 30-day cure period for a

default of a payment provision and a 60-day cure period for a default of any other provision.  If the Lessee failed to cure on time, the BIA could terminate the Lease.  *Id.*

### B. Lease Disputes, Notice of Default, and Cancellation

Between 1994 and 1999, Mr. Tuttle stopped making payments to the Tribes.  *See* AR 40.  When he started paying rent again in 1999, the Tribes refused to accept the payments, claiming that Mr. Tuttle had repudiated the Lease so that it was no longer valid.  *See* AR 40-41. In response, Mr. Tuttle challenged the 1986 Modification, claiming that the Tribes and the Bureau of Indian Affairs had coerced him into agreeing to it and arguing that it was invalid.  AR 40.  The parties reached a partial resolution in September 2004, whereby Mr. Tuttle paid the back rent that was due and, under protest, paid interest.  *Id.*

On May 18, 2005, the BIA Regional Director issued a decision on Mr. Tuttle's challenge to the Modification.  The Regional Director determined that the Modification constituted a valid contract and declared that BIA would enforce it.  *Id.*  The Regional Director further found that Mr. Tuttle had paid his outstanding obligations for Base Rent in full, that no notices of default had been issued, and thus the breach was cured and the Lease remained "in full force and effect."  *See* AR 42.  In addition, the Regional Director imposed interest on all late payments, including those the Tribes had refused to accept.  *Id.*

Mr. Tuttle appealed to the Interior Board of Indian Appeals (IBIA).  On February 7, 2008, the IBIA upheld the validity of the Modification, AR 52-53, but overturned the order that Mr. Tuttle pay interest on rental payments he had timely tendered but that the Tribes had refused to accept.  AR 54.  The IBIA remanded the case to the Regional Director to determine the amount due to Mr. Tuttle to compensate him for the overpayment of interest.  *Id.*  On September 23, 2009, the BIA Regional Director advised Mr. Tuttle by letter that his overpayment totaled $10,504.79 and that the Tribes and/or the Superintendent of the Colorado

River Agency would notify Mr. Tuttle by separate letter whether that amount would be refunded or credited.  AR at 33-34.

By a joint letter dated September 30, 2009, the Tribes and the Superintendent informed Mr. Tuttle that the Tribes had calculated that he was owed a credit in the amount of $10,504.79 toward the outstanding balance due under the Lease.  AR 26.  While Mr. Tuttle again had failed to pay Base Rent for 2005, 2006, and 2009, the credit was applied and these arrearages were offset for amounts due through March 21, 2009.  AR 27.  However, the September 30 letter also included a Notice of Default, informing Mr. Tuttle that he was in violation of the Lease because: (1) he had failed to pay Percentage Rent since March 1991; (2) he had failed to submit certified statements of gross business receipts for fiscal years (FY) 1992-2008; and (3) he had failed to provide proper proof of current public liability insurance and fire insurance.  AR 26-29.[5]  The Notice of Default also advised Mr. Tuttle that, under 25 C.F.R. § 162.618,[6] he had ten days from receipt of the Notice of Default to (1) cure the violations, (2) dispute the Notice of Default and/or (3) explain why the Lease should not be canceled or request more time to cure. AR 29.

In a letter received by the Tribes on October 13, 2009, Mr. Tuttle requested more time to respond to the Notice of Default due to "health problems."  AR 401.  Three days later, the Tribes received a second letter from Mr. Tuttle, which included an uncertified estimate of the gross receipts for business conducted on the Property, together with payment of three percent (3%) of that estimate, which he deducted from the monies owed to him.  AR 156.  Mr. Tuttle

---

[5] Mr. Tuttle had submitted an *application* for insurance coverage, not proof of a policy that had been issued.  AR at 29.

[6] Notice of Default mistakenly cited 25 C.F.R. § 162.118, instead of as § 162.618.

explained that "[t]he financial records of the sublessees are simple and not complicated. We would prefer not to incur the expense of having a Certified Public Accountant verify this . . . information." AR 157. Mr. Tuttle included an invoice for a public liability insurance policy effective from September 18, 2009 through September 18, 2010. AR 158. Mr. Tuttle also stated that he intended to appeal the IBIA's February 2008 decision to federal court. AR 157. There is no evidence in the record that Mr. Tuttle ever appealed the February 2008 IBIA decision.

On March 2, 2010, BIA's Superintendent of the Colorado River Agency sent a Notice of Cancellation of Lease to Mr. Tuttle by certified mail. AR 20-24. The Notice reiterated the Lease violations that had been identified in the Notice of Default: (1) failure to pay Base Rent due; (2) failure to pay Percentage Rent; (3) failure to provide certified statements of gross receipts; and (4) failure to provide proof of both public liability and fire insurance coverage in the name of both Mr. Tuttle and the Tribes. *Id.* The Notice of Cancellation waived default for failure to pay Base Rent for amounts that were due through March 21, 2009, because the offset more than covered the outstanding Base Rent. AR 22. However, the Notice explained that Mr. Tuttle's did not cure the other outstanding Lease violations, as required by 25 C.F.R. § 162.618. AR 21. Mr. Tuttle's estimate of an annual income of approximately $11,000 per year for 17 years did not satisfy the requirement that he provide a certified annual accounting, and without a proper accounting, there could be no offset from the Percentage Rent due. AR 21-22. Further, Mr. Tuttle's submission of a receipt for liability coverage did not state the amount of coverage, did not indicate that the Tribes were included as a co-insured, and did not demonstrate that Mr. Tuttle carried fire insurance for the Property. AR at 23. The Notice of Cancellation concluded, "For all of the foregoing reasons, and pursuant to the Default provisions of the Lease Addendum,

at Section 17(B)(2), the Bureau and the Tribes are hereby exercising their right to cancel Lease

No. B-509-CR . . . ." *Id.*

      The Notice informed Mr. Tuttle of his right to administratively appeal the

cancellation decision within 30 days of the date he received the Notice.  AR 24.  On March 11,

2010, Mr. Tuttle asked for a 45-day extension of time to cure all violations because his insurance

agent was unavailable due to illness.  AR 213.

### C. Administrative Appeals Culminating in This Suit

      Mr. Tuttle timely appealed the Notice of Cancellation to the BIA's Acting

Regional Director on April 1, 2010.  AR 4.  On April 29, 2010, the Acting Regional Director

notified Mr. Tuttle that the Notice of Cancellation was stayed by the filing of the appeal and that

he had 30 days to submit a Statement of Reasons.  AR 201.

      Mr. Tuttle submitted a Statement of Reasons on May 6, 2010.  AR 192-93.  He

stated that he had had a certificate of insurance for every year and that he sent the 2009-2010

certificate of liability insurance to the BIA, including evidence of the Tribes as additional named

insured.  AR 193.  He further indicated that his accountant was preparing certified statements

and he would pay what he owed when those were completed.  As a measure of good faith, he

indicated that he would send a check for $4,000 on the next day, which he diligently did.  AR

193, 198.  After consulting with the Tribes, BIA placed the check in a special deposit account

pending the decision on Mr. Tuttle's appeal.

      On May 17, 2010, the Acting Regional Director informed Mr. Tuttle that his

Statement of Reasons failed to explain why the Notice of Cancellation was in error, but that BIA

would give Mr. Tuttle additional time to amend his appeal documents to state clearly the bases

for his appeal.  AR 190.  Mr. Tuttle submitted another Statement of Reasons on May 25, 2010.

AR 167-170.  He claimed that the reasons for the Notice of Cancellation had "largely been

addressed and deficiencies resolved," and that "[t]he delays resulted from both health issues which affected the Petitioner's ability to deal with the business matters underlying the decision being appealed and the unavailability of Petitioner's Certified Accountant." AR 167. Mr. Tuttle included a compilation report prepared by a certified public account summarizing gross revenues received from leased premises and business rentals due and owing. AR 174-79. The accountant noted that the report had been "prepared on an accounting basis used by . . . individuals for U.S. Federal Income Tax purposes, which is a basis of accounting other than U.S. generally accepted accounting principles." AR 175. The accountant also stated, "We have not audited or reviewed the accompanying statement of financial condition and, accordingly do not express an opinion or any other form of assurance on it." *Id.* Mr. Tuttle submitted a second check in the amount of $5,408.10 to satisfy his Percentage Rent obligations, according to his own calculation. AR 183.

Finding these reasons inadequate, the Acting Regional Director affirmed the Notice of Cancellation on July 19, 2010. AR 121-127. The July 19 decision emphasized that the Notice of Default was issued on September 30, 2009, but Mr. Tuttle had made no attempt to cure until "long after the cure period" had expired. AR 125. The Acting Regional Director further decided that Mr. Tuttle's right to cure had expired at the end of the cure period in the Lease and that his submissions in May 2010 were insufficient to effect a cure "without the express waiver and consent" of the Tribes. *Id.* The Acting Regional Director added, "our regulations provide that where a lessee fails to cure within the requisite time period, we should consult with the Indian landowner and determine whether the lease should be cancelled." AR 125-26 (citing 25 C.F.R. § 162.619(a)).

On August 18, 2010, Mr. Tuttle filed a notice of appeal to the IBIA. AR 116-120. He alleged that the termination was erroneous as a matter of fact and that all deficiencies were

cured prior to the termination.  AR 116-17.[7]  After full briefing from Mr. Tuttle, BIA, and the

Tribes, on December 18, 2012, the IBIA affirmed.  AR 274-283.  The IBIA found that the record

supported the finding that Mr. Tuttle violated the Lease and that he did not timely cure.  AR 282.

Mr. Tuttle did not make "any convincing argument that BIA's decision to cancel the [L]ease, in

the face of the uncured violations was an abuse of discretion."  *Id.*

   Challenging the IBIA decision under the Administrative Procedure Act (APA), 5

U.S.C. §§ 701 *et seq*., Mr. Tuttle sued the Department of the Interior and, in their official

capacities, the Secretary of the Department of the Interior, Sally Jewell, and the Assistant

Secretary for Indian Affairs, Kevin Washburn (collectively, the Secretary).  Mr. Tuttle claims

that the Secretary's termination of the Lease was arbitrary and capricious, beyond the scope of

the IBIA's authority, and not in accordance with the law.  *See* Compl. [Dkt. 1] ¶¶ 6, 58.  The

parties have filed cross motions for summary judgment.  *See* Pl. Mot. for Summ. J. [Dkt. 24] (Pl.

MSJ); Def. Mot. for Summ. J. [Dkt. 26]; Def. Mem. in Support [Dkt. 27]; Pl. Reply [Dkt. 33];

Def. Reply [Dkt. 36].[8]

---

[7] Mr. Tuttle also claimed, without authority, that the Property was under the jurisdiction of the
Bureau of Reclamation and/or the Bureau of Land Management and therefore the BIA had no
authority to terminate the Lease.  AR 117.  He does not pursue such a claim here.

[8] Mr. Tuttle alleges that he owned the land in fee simple prior to executing the Lease and that he
entered into the Lease because he was pressured to do so by the Secretary.  *See* Compl. ¶ 13.
Even though he does not seek to relitigate the issue of title to the Property, *see* Pl. Reply at 17, as
the matter was decided in *United States v. Brigham Young University*, No. CV 72 3058-DWW
(C.D. Cal. 1977), Mr. Tuttle filed a declaration describing his belief that he was entitled to fee
simple ownership of the Property and attaching a report from an alleged "Title Specialist"
supporting this claim.  *See* Pl. MSJ, Ex. A [Dkt. 24-2] (Tuttle Decl.).  The Secretary moves to
strike the Declaration, *see* Mot. to Strike [Dkt. 29], because it is extra-record evidence that is not
permitted in an APA case without a strong showing of unusual circumstances justifying
departure from the general rule.  *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C.
Cir. 2008).  The motion to strike is well-founded, and Mr. Tuttle's Declaration is not material to
the Court's decision here.  The Declaration will be stricken.

## II. LEGAL STANDARDS

IBIA's ruling is a final agency action subject to review under the APA.  *See Feezor v. Babbit*, 953 F. Supp. 1, 5 (D.D.C. 1996).  This Court has subject matter jurisdiction under 5 U.S.C. § 701 *et seq.* and 28 U.S.C. §§ 1331 and 2201.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In reviewing a final agency action under the Administrative Procedure Act, however, the standard set forth in Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (internal citation omitted), *appeal dismissed*, Nos. 06-5419 & 07-5004, 2007 WL 1125716 (D.C. Cir. Mar. 30, 2007); *see also Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012).  Under the APA, the agency's role is to resolve factual issues to reach a decision supported by the administrative record, while the district court role is to determine whether as a matter of law the evidence in the administrative record allowed the agency to make the decision it did.  *Sierra Club*, 459 F. Supp. 2d at 90.  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.*

In determining whether an action was arbitrary and capricious under the APA, a reviewing court must consider whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  At a minimum, the agency must have considered relevant data and articulated an explanation

establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal quotation marks and citation omitted); *see also Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). An agency action is arbitrary or capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Rather, agency action is normally "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

## III. ANALYSIS

### A. Prudential Standing and the Zone-of-Interests Test

The Secretary moves to dismiss for lack of prudential standing under the zone-of-interests test. Under that test, a court must ask whether the plaintiff's interests are "arguably" within the zone of interests to be protected or regulated by the statute he claims was violated. *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). In an APA case, the plaintiff's cause of action must be within the zone of interests of the relevant underlying substantive statute. *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 55 (D.D.C. 2013).

"The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Id.* (quoting *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399 (1987)).

The Supreme Court recently clarified that (1) the zone-of-interests test no longer falls under the prudential standing umbrella and (2) it is not a jurisdictional requirement.[9] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-87 & 1387 n.4 (2014); *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 319 (D.C. Cir. 2015).  Instead, the Supreme Court held that the zone of interests test is a merits issue that requires a court to apply traditional principles of statutory interpretation to determine whether the plaintiff has a cause of action under the statute at issue.  *Lexmark,* 134 S. Ct. at 1387.

Here, the Secretary asserts that the Indian Long Term Leasing Act protects only Indian land owners and because Mr. Tuttle is not an Indian he cannot invoke the protections of the Act.  *See Hollywood Mobile Estates Limited v. Seminole Tribe of Fla.*, 641 F.3d 1259 (11th Cir. 2011).  In *Hollywood Mobile Estates*, a non-Indian business lessee filed suit against the Seminole Tribe and the Secretary of the Interior to enjoin the Tribe from repossessing the property.  *Id.* at 1262-63.  After the complaint was filed, the Seminole Tribe asked the BIA to cancel the lease, but the BIA declined because it found that the tenant had not violated the lease. *Id.* at 1263.  The court held that the interests of the non-Indian tenant were not within the zone of interests protected by the Indian Long-Term Leasing Act.  *Id.* at 1269.  Consistent with the long-standing relationship between Indians and the Secretary in which the Secretary acts as a fiduciary

---

[9] Previously, the D.C. Circuit had considered prudential standing to be a threshold jurisdictional issue.  *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013).

with respect to Indian property, the Act provides that restricted Indian lands can be leased only with the approval of the Secretary. Without probing analysis, the court held that the statute and its regulations "protect Indian landowners, not non-tribal lessees." *Id*. at 1270.[10]

*Hollywood*, which does not bind this Court, reads the statute and its zone of interests too narrowly. The zone of interests governed by the statute and its accompanying regulations concern the leasing of Indian-owned land, without regard to the identity of the lessee. The Act expressly provides:

> Prior to approval of any lease or extension of an existing lease pursuant to this section, the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to  . . . the availability of police and fire protection and other services; the availability of judicial forums for all criminal and civil causes arising on the leased lands; and the effect on the environment of the uses to which the leased lands will be subject.

25 U.S.C. § 415(a).

Both lessor and lessee are benefitted by the Secretary's consideration of the availability of police and fire protection and judicial resolution of disputes. In addition, the regulations specifically provide protections for lessees. If a lease of Indian land is violated, the lessee must be provided notice and an opportunity to cure. *See* 25 C.F.R. § 162.618. Also, if a lease cancelled, the Secretary must provide notice to the tenant, including a right to appeal the cancellation decision. *Id*. § 162.619. Because Mr. Tuttle's interests are "arguably" within the ambit of the Act and its regulations, the zone of interests test is satisfied and the case will not be dismissed on that ground. *Patchak*, 132 S. Ct. at 2210.

---

[10] In *Hollywood*, the court also found that the plaintiff lacked standing to sue the Secretary because there was no allegation that the Secretary had taken any action that caused an injury to the plaintiff. 641 F.3d at 1265-66. In contrast, the Secretary had an active role in the case at hand. The BIA, through the Superintendent of the Colorado River Agency, issued the Notice of Default and the Notice of Cancellation to Mr. Tuttle.

**B. Cancellation Did Not Violate the Lease or the Regulations**

Mr. Tuttle erroneously argues that the BIA violated the terms of the Lease and the statutory regulations.  Mr. Tuttle claims that BIA violated his rights under the Lease by failing to allow him an opportunity to cure under Article 17, and only providing notice and opportunity to cure under 25 C.F.R. § 162.618.  Perceiving some kind of conflict between the regulations and the Lease, Mr. Tuttle argues that the Lease terms control.

The argument fails to appreciate that the Lease specified that it was subject to the Indian Long-Term Leasing Act, its regulations, "and any amendments thereto relative to business leases on restricted Indian lands."  *See* AR 239.  Under the express terms of the Lease, therefore, the regulations at 25 C.F.R. Part 162 were fully applicable despite the fact that they did not become effective until five years after the Lease was signed.

As described above, Article 17 of the Lease provided that in the event of default, the BIA was required to send a written notice of such default to Mr. Tuttle, providing time to cure.  AR 262-63.  If Mr. Tuttle failed to cure on time, the BIA was authorized to terminate the Lease.  *Id.*  The then-applicable regulations similarly provided for notice and opportunity to cure and in the absence of a cure, authorized cancellation.  Section 162.618 of the regulations provided that if BIA determined that a lease was violated, it was required to send the tenant a notice of violation.  25 C.F.R. § 162.618(a).[11]  Within 10 days, the tenant was required to cure, dispute the notice, or request additional time to cure.  *Id.* § 162.618(b).  If the tenant did not

---

[11] When BIA's Superintendent issued the Notice of Cancellation in 2009, when the BIA's Acting Regional Director affirmed the cancellation in 2010, and when the IBIA affirmed the cancellation in 2012, the regulation at 25 C.F.R. §§ 162.618-.619 applied.  *See* Def. Mem. in Support, Ex. 1 [Dkt. 27-1] (Copy of Regulations).  This regulation is no longer in effect.

timely cure, § 162.619(a) required BIA to consult with the Indian landowner and decide whether

to cancel the lease or pursue other remedies:

> (a) If the tenant does not cure a violation of a lease within the requisite time period, [BIA as the Secretary's delegee] will consult with the Indian landowners, as appropriate, and determine whether:
>
> (1) The lease should be canceled by us under paragraph (c) of this section and §§ 162.620 through 162.621 of this subpart;[12]
>
> (2) We should invoke any other remedies available to us under the lease, including collecting on any available bond;
>
> (3) The Indian landowners wish to invoke any remedies available to them under the lease; or
>
> (4) The tenant should be granted additional time in which to cure the violation.

*Id*. § 162.619(a).[13]  Further, if BIA decided to cancel the lease, it was required to send the tenant

notice of cancellation and a thorough explanation:

> (c) If we decide to cancel the lease, we will send the tenant and its sureties a cancellation letter within five business days of that decision.  The cancellation letter must be sent to the tenant by certified mail, return receipt requested.  We will also provide actual or constructive notice of a cancellation decision to the Indian landowners, as appropriate.  The cancellation letter will:
>
> (1) Explain the grounds for cancellation;
>
> (2) Notify the tenant of the amount of any unpaid rent, interest charges, or late payment penalties due under the lease;
>
> (3) Notify the tenant of its right to appeal . . . ;

---

[12] 25 C.F.R. §§ 162.620 & 162.621 do not apply here, as they concern the cancellation of agricultural leases.

[13] If a tenant was given additional time to cure, the tenant was required to "proceed diligently to complete the necessary corrective actions within a reasonable or specified time period from the date on which the extension is granted."  25 C.F.R. § 162.619(b).

> (4) Order that the tenant vacate the property within 30 days of the receipt of the cancellation letter, if an appeal is not filed by that time.

*Id.* § 162.619(c).

The BIA followed the default and cancellation procedure set forth in the Lease and regulations. The Superintendent, together with the Tribes, sent a Notice of Default to Mr. Tuttle on September 30, 2009, in compliance with Article 17 of the Lease and § 162.618 of the regulations. The Notice of Default detailed the Lease violations and advised Mr. Tuttle that he had 10 days to cure, dispute the default, or request additional time. AR 26-29.

In a letter received by the Tribes on October 13, 2009, Mr. Tuttle requested more time to respond to the Notice of Default due to "health problems." AR 401. Three days later, the Tribes received a second letter from Mr. Tuttle purporting to cure the Lease violations. In fact, contrary to the Lease requirements, he provided an uncertified estimate of his gross receipts, refusing to incur the expense of a certified public accountant for verification. AR 156. He also provided inadequate evidence of insurance, as the invoice he provided did not show the amount of liability coverage, did not show the Tribes as an additional insured, and did not prove that he carried fire insurance. AR 158.

On March 2, 2010, the Superintendent properly issued a detailed Notice of Cancellation, as required by 25 C.F.R. § 162.619.[14] AR 20-24. Because five months had passed since the September 2009 Notice of Default, ample opportunity to cure was provided. Mr. Tuttle's estimate of an annual income of approximately $11,000 per year for 17 years did not

---

[14] After following the procedure for cancellation, the Lease permits BIA to "[r]e-enter the Property and remove all persons and property therefrom" and either re-let the premises without terminating the Lease or terminate the Lease. AR 262-63. BIA has not yet taken the eviction and re-leasing steps set forth in the Lease because lease termination has been stayed by Mr. Tuttle's appeals to the Acting Regional Director, IBIA, and this Court.

satisfy the requirement that he provide a certified annual accounting.  AR 21-22.  Also, Mr.

Tuttle's submission of a receipt for liability insurance coverage did not constitute proof of the

amount of coverage or that the Tribes were named as additional insured.  Nor did he submit

proof of fire insurance coverage.  *Id.*

### C. BIA Did Not Delegate Its Authority to the Tribes

Mr. Tuttle claims that the BIA performed no independent review of the bases for

cancellation of the Lease and that it allowed the Tribes to draft all documents and make all

decisions.  He asserts that such improper delegation of authority violated the Lease because only

the Secretary of the Interior could effect a Lease cancellation.[15]  He further contends that this

"wholesale delegation of the Lease cancellation process" to the Tribes exceeded the statutory

authority set forth in the Indian Long-Term Leasing Act, 25 U.S.C. § 415, *see* Pl. MSJ at 26, and

was arbitrary, capricious, and *ultra vires* in violation of the APA.[16]

Mr. Tuttle cites the July 19, 2010, letter to him from the BIA's Acting Regional

Director that affirmed the Superintendent's decision to cancel the Lease, *see* AR 125, as proof

that BIA improperly delegated the cancellation decision to the Tribes.  Most particularly, Mr.

---

[15] Mr. Tuttle's further allegations that BIA and the Tribes consulted or coordinated on legal strategy once he challenged the Lease termination are not relevant, since the issue is Lease cancellation.

[16] Mr. Tuttle erroneously cites the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450f *et seq.*, which prohibits Indian tribes from unilaterally canceling residential leases. This reference provides no support for Mr. Tuttle's case, as the Lease at issue was a not a residential lease governed by that statute.  Although the Lease permitted Mr. Tuttle to reside on the land, the Lease was expressly titled "Business Lease"; it permitted the Property to be used for business purposes; it required the payment of Percentage Rent based on gross business receipts; it was subject to the approval of the Secretary under the Indian Long-Term Leasing Act, 25 U.S.C. § 415; and it was governed by regulations concerning business leases on restricted Indian Land.  AR 75, 239-40, 248.

Tuttle attacks the Acting Regional Director's statement that Mr. Tuttle no longer "had the right to cure the default without the express waiver and consent" of the Tribes. *See* AR 125-26. Mr. Tuttle interprets the July 19, 2010 letter as an admission by the Acting Regional Director that "no decision could be made" without the consent of the Tribes and that "the Department could not render any decision other than a decision formulated or approved by" the Tribes. Pl. Reply at 14. In furtherance of his argument that there was improper "federal fealty" to the Tribes, *id.*, Mr. Tuttle contends that the Tribes' legal team was directly involved in drafting proposed decision materials that were in turn forwarded to the Secretary for review, edits, and return to the Tribes for finalization. *Id.* at 13 n.6 (citing AR Supp. 22-25, 85, 88-100, 219-25, 261-63).

Mr. Tuttle is correct that Article 17 of the Lease requires the BIA to decide whether to terminate the lease. Nonetheless, Mr. Tuttle's argument is fundamentally flawed. Both the Lease and Modification were executed by Mr. Tuttle as Lessee and the Tribes as Lessor. Further, the Tribes' substantive interest in receipt of rental payments and enforcement of other Lease terms cannot be gainsaid. Mr. Tuttle's statement that the Tribes' lawyers were involved in drafting proposed decision materials which were forwarded to BIA for review and edits and returned to the Tribes for finalization admits the superior position of BIA to review, comment, and edit as it found necessary. *See* AR Supp. 225 (BIA states that "[s]ince this is a cancellation letter, appeal language needs to be added."), *id.* 228 (counsel for the Tribes noted that he "replaced the appeal provisions originally contained in the cancellation letter" with language suggested by BIA); *id.* 331 (BIA asks that Notice of Cancellations be amended to correct a citation and to include a specific notice of appeal rights); *id.* 244 (counsel for Tribes notes that he "changed the CFR citation last week" as suggested by BIA); *id.* 250 (counsel for Tribes tells BIA "here is the redraft of the Tuttle letter – if it needs any polishing, or major

20

repairs, let me know.").  Because BIA and the Tribes consulted and agreed on the outcome does not prove that BIA failed to exercise independent review and consideration of the underlying facts, which were well known and had been ongoing in one iteration or another for years.  Mr. Tuttle's record citations prove no more.  The argument that "every decision and action document was written by the . . . Tribes and forwarded to the federal Defendants who rotely endorsed every action proposed," Pl. MSJ at 4, not only contradicts Mr. Tuttle's earlier admissions that documents were forwarded for BIA's review, edits, and return but also is unsupported.

BIA's statement that Mr. Tuttle could not cure his breaches without a waiver from the Tribes was correct under the law.  The regulations required BIA to consult with the Indian landowners to decide whether to cancel the lease, invoke other remedies, or grant the tenant additional time to cure.  25 C.F.R. § 162.619(a)(1)-(4).  The BIA properly consulted with the Tribes, but it had no power or authority to *require* the Tribes to accept Mr. Tuttle's attempted late cure.

Mr. Tuttle contends that his long delay in attempting to cure should be excused for reasons of ill health and advanced age.  He was in his late 80s at the time the Notice of Default and Notice of Cancellation were issued.[17]  To Mr. Tuttle's detriment, however, the admitted facts demonstrate that he failed to pay Base Rent and Percentage Rent when due for many years and that he failed to submit adequate proof of insurance and properly audited business income statements as required by the Lease.  BIA twice extended the opportunity to provide reasons not to terminate the Lease but Mr. Tuttle's submissions were vague efforts at partial cures.  The Court appreciates Mr. Tuttle's age and health issues, but the Lease did not

---

[17] Mr. Tuttle was 92 years old when he died.  Because the Notice of Default was issued in 2009 and the Notice of Cancellation was issued in 2010, Mr. Tuttle would have been approximately 87 years old during the relevant time period.

require BIA or the Tribes to accept a long-overdue cure or to find that Mr. Tuttle's submissions constituted a satisfactory cure.[18]

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Dkt. 24] will be denied, and Defendants' motion for summary judgment [Dkt. 26] will be granted.  Judgment will be entered in favor of Defendants.  Defendants' motion to strike [Dkt. 29] will be granted and Plaintiff's Declaration [Dkt. 24-2] will be stricken.  A memorializing Order accompanies this Opinion.

Date: March 11, 2016

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

---

[18] In his motion for summary judgment, Mr. Tuttle asserts a claim for deprivation of due process that he did not allege in the Complaint.  *See* Pl. MSJ at 26-27.  It is well-established that a party may not amend a complaint through summary judgment briefing.  *District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010).  Moreover, the notice and opportunity to be heard provided to Mr. Tuttle through the administrative process and in this Court satisfies due process.